UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA
MINNEAPOLIS DIVISION

In Re:

Chapter 11

Donald Andrew Driggs                                                         Case No. 13-42355

Debtor.

---

## AMENDED OBJECTION TO THIRD MODIFIED PLAN

---

TO: Donald Andrew Driggs and Entities as Specified in Local Rule 3020-1(b),

CitiMortgage, Inc., ("CitiMortgage") hereby objects to the confirmation of the Debtor's

Third Modified Plan.

## INTRODUCTION

CitiMortgage ["Class 1"] is the holder of a note given by the debtor and a mortgage

encumbering the property located at 3990 Sunset Drive, Spring Park, MN 55384 and legally

described as:

> PARCEL 1:
> LOT 13, SKARP AND LINDQUIST'S HAZELDELL ADDITION TO MINNETONKA,
> ACCORDING TO THE RECORDED PLAT THEREOF, HENNEPIN COUNTY, MINNESOTA.
> ABSTRACT PROPERTY
>
> PARCEL 2:
> LOT 26, TOGO PARK, LAKE MINNETONKA, ACCORDING TO THE RECORDED PLAT
> THEREOF, HENNEPIN COUNTY, MINNESOTA.

The mortgage is dated January 29, 2003 and was recorded in the office of the Hennepin County

Recorder on March 13, 2003 as Document No. 7974914 and registered in the office of the

Hennepin County Registrar of Titles on April 3, 2003, as Document No. 3713492. The mortgage

was thereafter assigned to CitiMortgage. CitiMortgage filed a proof of claim indicating that the

total amount due and owing under the note and mortgage was $691,492.69. (Proof of Claim No.

9.)

**OBJECTION**

1.      The Court has jurisdiction over this Objection pursuant to 11 U.S.C. §§ 1128(b), 1129 and Federal Rules of Bankruptcy Procedure 3020.

2.      CitiMortgage objects to the debtor's Third Modified Plan of Reorganization as it does not meet the requirements of 11 U.S.C. § 1129(b). More specifically, CitiMortgage objects to the plan treatment as follows:

      a.   The debtor has not met his burden of proof to reduce CitiMortgage's secured claim. The debtor provides that the value of the Property is $425,000.00. (Third Mod. Plan, ECF No. 107, Class 1.) Because the debtor has not provided credible evidence to reduce the secured claim, the secured claim of CitiMortgage should be $691,492.69.

      b.   The interest rate on the loan at the time of filing was 4.5 percent per annum. (Proof of Claim No. 9.) The debtor provides the interest rate will be 4.25 percent per annum. (Third Mod. Plan, ECF No. 107, Class 5.) CitiMortgage believes the terms of the appropriate rate is 4.5 percent per annum.

3.      CitiMortgage further objects to the plan because it impermissibly modifies a claim secured by the debtor's principal residence in violation of 11 U.S.C. § 1123(b)(5).

4.      CitiMortgage further objects to the plan because the plan was not proposed in good faith in violation of 11 U.S.C § 1129(a)(3).

5.      CitiMortgage further objects to the plan because the plan is not feasible as required by 11 U.S.C. § 1129(a)(11).

6.      CitiMortgage further objects to the plan because the plan does not meet the best

interests test of 11 U.S.C. § 1129(a)(7).

7.      CitiMortgage further objects to the plan for its unsecured claim (if any) because

the plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).


**ARGUMENT**

**I.      CitiMortgage believes its secured claim should be the full amount of its claim and objects to the cramdown of its secured claim.**

*11 U.S.C. § 506.* Section 506(a)(1) of the Bankruptcy Code divides creditors' claims

against a debtor into "secured" and "unsecured" claims based on the value of the underlying

collateral. Harmon v. United States, 101 F.3d 574, 578 (8th Cir. 1996). Under § 506(a)(1), an

allowed claim secured by a lien on the debtor's property "is a secured claim to the extent of the

value of [the] creditor's interest in the estate's interest in such property . . . and is an unsecured

claim to the extent that the value of [the] creditor's interest . . . is less than the amount of such

allowed claim." 11 U.S.C. § 506(a)(1). CitiMortgage believes that the debtor has not presented

sufficient evidence to determine the secured claim, and therefore the debtor may not modify the

amount of the claim. The debtor provides a value of $425,000, but does not provide any

admissible evidence to establish that value.[1] In the debtor's 2008 chapter 11 case, the debtor first

asserted that the 3990 Sunset Drive property was valued at $1,250,000.00. (Dobie Decl. ¶ 10.)

Later, on April 27, 2009, the debtor asserted and the Court ordered that the property was valued

at $600,000. (Dobie Decl. ¶ 14, Ex. I.) CitiMortgage has provided the Court with an appraisal

providing a value of $600,000. (Third Dobie Decl. ¶ 2, Ex. A.) The debtor has failed to provide

the Court with any admissible evidence that the 3990 Sunset Drive property is now valued at $425,000.00 as the plan now suggests. As such, the Court should not confirm the plan.

*11 U.S.C. § 1129(b)(2).* The first cramdown requirement of 11 U.S.C. § 1129(b)(2)(A)(i)(I) requires that the secured creditor retain its lien. The plan does not specifically provide that CitiMortgage retains its lien, so the plan cannot be confirmed as-is.

The second cramdown requirement in Section 1129(b)(2)(A)(i)(II) requires a debtor's plan to provide the secured creditor with deferred payments having a present value in the full amount of the creditor's secured claim. The debtor fails to comply with Till v. SCS Credit Corp., 541 U.S. 465 (2004) in determining the proposed interest rate of the secured claim. Till provides that the starting point is the national prime rate of interest, and then the Court should add a risk adjustment. Id. at 479. The appropriate size of the risk adjustment depends on such factors as (1) the circumstances of the bankruptcy estate; (2) the nature of the security; and (3) the duration and feasibility of the reorganization plan. Id.  The prime rate at the time of filing was 3.25 percent, and CitiMortgage believes that the rate at the time of filing of 4.5 percent per annum adequately accounts for the risk of this loan given the debtor's prior bankruptcy and credit history.

The loan is due for the July 1, 2011, payment and thereafter. (Proof of Claim No. 9.) In the debtor's 2008 bankruptcy case, the debtor's confirmed plan provided an interest rate of 4.5 percent. (Dobie Decl. ¶ 15, Exhibit J.) The prime rate at the time of the 2008 petition and confirmation was 3.25 percent. For three years, the debtor has been unable to reorganize and produce rents sufficient to make the current payments. The debtor's plan of reorganization is not

---

[1]  The debtor recently obtained an appraisal, but it is not clear that his appraisal supports the proposed plan.

feasible as noted <u>infra</u>, § III. Thus, the prior plan rate adequately accounts for the risk of default and CitiMortgage requests that the Court sustain CitiMortgage's objection to the interest rate cramdown.

**II.**     **<u>The plan impermissibly modifies a CitiMortgage's secured claim, secured only by a security interest in real property that is the debtor's principal residence in violation of 11 U.S.C. § 1123(b)(5).</u>**

The debtor may not modify a secured claim which is secured by the debtor's principal residence. 11 U.S.C. § 1123(b)(5); <u>see also</u> <u>In re Wages</u>, 508 B.R. 161, 168 (9th Cir. B.A.P. March 7, 2014) (pursuant to Section 1123(b)(5) the court held that "the anti-modification exception applies to any loan secured only by real property that the debtor uses as a principal residence property, even if that real property also serves additional purposes"); <u>In re Macaluso</u>, 254 B.R. 799 (Bankr. W.D.N.Y. 2000) (same result interpreting Section 1322(b)(2)); <u>cf.</u> <u>In re Scarborough</u>, 461 F.3d 406, 414 (3d Cir.2006)(debtor may modify secured claim of principal residence of multi-unit property despite Section 1322(b)(2) anti-modification rule); <u>In re Brunson</u>, 201 B.R. 351, 353 (Bankr. W.D.N.Y.1996) (case by case approach: "[e]ach case must turn on the intention of the parties").  There is no dispute that the debtor lives in Unit 3, the largest unit of 3990 Sunset Drive, Orono, Minnesota, the property secured by CitiMortgage's claim. Because CitiMortgage's claim is secured by real property that is the debtor's principal residence, the debtor may not modify CitiMortgage's claim and the plan may not be confirmed.

**III.**     **<u>The plan was not proposed in good faith in violation of 11 U.S.C § 1129(a)(3).</u>**

Section 1129(a)(3) requires that the plan was proposed in good faith. Prior to the debtor filing the present bankruptcy petition, CitiMortgage had a foreclosure sale of the Property

scheduled for June 22, 2013 at 11:00AM. (Dobie Decl. ¶ 5, Ex. A.) The debtor filed the present

petition in the morning on May 8, 2013, to stop the sale of another property as well as the 3990

Sunset Drive property. In the initial Disclosure Statement, the debtor acknowledged the petition

was filed to stop the sale of 4400 Deering Island. (ECF No. 33, at 6.) At least three foreclosure

sales were pending at the time of the bankruptcy filing, and the debtor was playing games and

using Minnesota Statute section 580.07, the postponement statute, in order to delay the

foreclosures of the other two properties. CitiMortgage had originally scheduled a foreclosure

sale for the property located at 3990 Sunset Drive, Spring Park, Minnesota for January 22, 2013.

(Dobie Decl. ¶ 5, Ex. A.) On January 4, 2013, the debtor executed and recorded an Affidavit of

Postponement pursuant to Minnesota Statutes § 580.07 to postpone the sale five months, to June

22, 2013. (Id.) In that affidavit, the debtor swore that the property was classified as a homestead

under Minnesota Statutes section 273.124, and that he occupied the property as his homestead.

(Id.) Less than three weeks later, on January 23, 2013, the debtor executed another Affidavit of

Postponement, swearing that the property located at 2925 Casco Point Road, Wayzata,

Minnesota, was classified as homestead under section 273.124, and that he occupied this

property as his homestead, in order to postpone the February 7, 2013, foreclosure sale scheduled

for that property. (Dobie Decl. ¶ 6.) The debtor made false statements in each affidavit, under

oath, regarding the homestead status and his occupancy at each property.

Neither property was classified as homestead for tax purposes under Minnesota Statutes

section 273.124. (Dobie Decl. ¶¶ 7-8, Exs. C-D.) Thus, those statements were false and neither

property was eligible for a five-month postponement by the debtor. Furthermore, the debtor has

acknowledged that he lived at 3990 Sunset Drive, Apartment no. 3, Spring Park, Minnesota from

November 2012 to the present. (ECF No. 11, at 32.) Thus, his sworn statement regarding his

occupancy of 2925 Casco Point Road, Wayzata, Minnesota, on January 23, 2013, in the

Affidavit of Postponement was false.

Additionally, in December 2012, the debtor granted a security interest to an insider, his

brother, A.J. Driggs, on "various boats" for a loan of $25,000, at 6% interest. (Third Am. Discl.

Stat., ECF No. 106.) No proof of claim has been filed by A.J. Driggs. The boats have a value of

$32,450 according to the debtor's Third Amended Disclosure Statement. (Id.) In the prior 2008

case, the debtor scheduled the value of one boat alone at $45,000. (Dobie Decl. ¶ 10, Case No.

08-41984, ECF No. 10, Schedule B.) This transaction is highly suspicious at best, and at worst,

appears to be part of a scheme to protect the boats from creditors.

The debtor's prior bankruptcy petition was filed on April 24, 2008 and was dismissed on

June 19, 2012. The creditors involved in that case gave the debtor ample time to reorganize. The

debtor previously obtained an order determining the value at $600,000. (Dobie Decl. ¶ 14, Ex. I.)

Only now, the debtor asserts that the Property is worth substantially less than what is owed.

After several creditors decided to foreclose, the debtor began playing games with the Minnesota

postponement statute, and filed the present petition on May 8, 2013, approximately one month

before CitiMortgage's foreclosure sale, in order to stop the sale. Thus, the Court should not

confirm the plan because the plan does not meet the good faith requirement. The debtor made

false statements regarding the homestead status of the property in order to delay the foreclosure

sale, and the debtor's valuations are not supported by admissible evidence.


**IV.**  **CitiMortgage objects to confirmation because the plan is not feasible.**

CitiMortgage objects to the plan because the plan is not feasible. CitiMortgage believes

the plan is likely to be followed by a liquidation and further reorganization and the plan is not

feasible as required by 11 U.S.C. § 1129(a)(11). Past performance is a generally accepted factor to consider in determining the reliability of future projections. In re Am. Consol. Transp., 470 B.R. 478, 490 (Bankr. N.D. Ill. 2012). The Tenth Circuit B.A.P. has stated: "A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the Plan is not feasible." Id. (quoting F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Southwest, Inc.), 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) (internal quotation marks omitted)).

The debtor's prior chapter 11 petition from 2008 was dismissed in 2012. That plan was followed by a need for further reorganization (this case).  During and since the 2008 case, the debtor has failed to bring in the rental income that he projected in his previous plan. According to his monthly operating reports, he is not bringing in the monthly income he projects in his proposed plan. The debtor is now occupying the most valuable unit, which he claims could be yielding $1,295 per month. Because he is living in this unit, the debtor cannot collect income to support the payments on the secured claim.

Unfortunately, the debtor has been unable to create the rental business he expected over the past six years. There is nothing in the record to suggest that will change now. Because the debtor's use of the property detracts from the rental income required to support the monthly payments, this plan is not feasible.

## V.   CitiMortgage objects to the plan because the plan does not meet the best interests test of 11 U.S.C. § 1129(a)(7).

Under 11 U.S.C. § 1129(a)(7)(ii), each dissenting creditor must receive at least as much as they would in a hypothetical liquidation. CitiMortgage has presented evidence that in a liquidation, the property is worth $600,000. (Third Dobie Decl. ¶ 2, Ex. A.) Because the plan

does not provide CitiMortgage with the present value of its secured claim, CitiMortgage believes

the plan does not satisfy the best interests test.

## VI.    CitiMortgage objects to the plan for its unsecured claim because the plan violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii).

CitiMortgage believes that the classification of claims and the debtor's retention of pre-

petition property violates the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B)(ii). Every

unsecured creditor must be paid in full before a debtor can retain "any property" under a plan.

11 U.S.C. § 1129(b)(2)(B)(ii); see also Ice House Am. LLC v. Cardin, No. 13-5764, ___ F.3d

___, (6th Cir. May 13, 2014); In re Stephens, 704 F. 3d 1279 (10th Cir. 2013); In re Lively, 717

F. 3d 406 (5th Cir. 2013); In re Maharaj, 681 F. 3d 558 (4th Cir. 2012). The Third Modified Plan

of Reorganization provides that Class 8 is unimpaired and that all other classes are impaired,

including the unsecured claims. According to the debtor's Amended Schedules, the debtor has

assets that he has not addressed in his plan. The debtor intends to retain his interests in various

businesses including Black Lake LLC, which he valued at $50,000, One Mile Long LLC, which

he valued at $1,000, and Regal One LLC, which he valued at $1,200. (Docket No. 40.) Thus, it

appears that he will retain a significant amount of property in violation of the absolute priority

rule.

## CONCLUSION

CitiMortgage requests that the Court sustain its objections and deny approval of the Third

Modified Plan.

Dated: _____August 18, 2014_____        USSET, WEINGARDEN & LIEBO, P.L.L.P.

By:      /s/ Kevin T. Dobie
Kevin T. Dobie #388322
Attorney for Creditor
4500 Park Glen Road, #300
Minneapolis, MN 55416
(952) 925-6888

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA
MINNEAPOLIS DIVISION

In Re:

                                        Chapter 11

Donald Andrew Driggs                            Case No. 13-42355

**THIRD DECLARATION OF
KEVIN T. DOBIE**

                  Debtor.

---

KEVIN T. DOBIE under the penalty of perjury states as follows:

1.        Attached as <u>Exhibit A</u> is a true and correct copy of the appraisal of CitiMortgage, Inc. for the real property located at 3990 Sunset Drive, Spring Park, Minnesota.


I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed this 18th day of August, 2014.


_____
KEVIN T. DOBIE

EXHIBIT A

**Report Type**
Appraisal Report

**Effective Date**
August 11, 2014

**Client**

Usset, Weingarden & Liebo, PLLP
Attn: Kevin Dobie, Attorney
4500 Park Glen Road, #300
Minneapolis, MN 55416

**Subject Property**

**Residential Triplex Property**
3990 Sunset Drive
Spring Park, Minnesota 55384



File #: ▮▮▮▮▮▮

**Prepared By:**
Ethan Waytas, Appraiser
William R. Waytas, Appraiser

**Nagell Appraisal & Consulting, Inc.**
12805 Highway 55, Suite 300
Plymouth, Minnesota 55441
Tel: 952.544.8966 | Fax: 952.544.8969

EXHIBIT A

## NAGELL APPRAISAL & CONSULTING

**12805 Highway 55, #300**
**Plymouth, MN  55441**
*Established in 1968*

**Minneapolis: 952-544-8966**
**St. Paul:      651-209-6159**
**Central Fax:  952-544-8969**

Usset, Weingarden & Liebo, PLLP
Attn: Kevin Dobie, Attorney
4500 Park Glen Road, #300
Minneapolis, MN 55416

August 8, 2014

To Kevin:

In accordance with your request, an **appraisal report** has been made on the following described property:

| | |
|---|---|
| **Subject Property:** | Residential Triplex Property<br>3990 Sunset Drive<br>Spring Park, MN 55384 |

The property is legally described herein.  The appraisal assumes that the property meets all current environmental standards.  The appraisal analysis and conclusions are subject to certain limiting conditions and assumptions described herein.  The final value opinion, as of **August 7, 2014**, is:

| **Market Value:** | **$600,000** |
|---|---|
| Appraised value reflects real estate only, no FF&E or business value are included. | |

Our company has 12 employees, has been in business since 1968 and has sufficient knowledge, education, experience, resources and/or contacts to competently complete this assignment.  The accompanying report contains data secured from my personal investigation and from sources considered to be reliable; however, correctness is not guaranteed.  To the best of my knowledge and belief, the statements contained in this report are true and correct.  Neither my employment to make this appraisal, nor the compensation, is contingent upon the value reported.  This report has been prepared in conformity with the code of professional ethics and standards of professional appraisal practice of the Appraisal Institute and appraisal standards set forth by Uniform Standards of Professional Appraisal Practice.

Sincerely,

Ethan Waytas
Trainee Appraiser MN 40368613

William R. Waytas
Certified General MN 4000813

**www.callnagell.com**

EXHIBIT A

## *TABLE OF CONTENTS*

### Property Description

SUMMARY OF IMPORTANT FACTS & CONCLUSIONS............................................... 1

INTRODUCTION............................................................ 2

VALUE TYPE, CONDITION & STABLILITY OF PROPERTY ............................................. 3

INTENDED USE OF THE APPRAISAL ........................ 3

DATE OF APPRAISAL............................................. 3

SCOPE OF THE APPRAISAL REPORT....................... 4

PROPERTY RIGHTS APPRAISED ............................. 5

PERSONAL PROPERTY............................................. 5

IDENTIFICATION.................................................... 6

REAL ESTATE TAXES ............................................ 6

SUBJECT SALES & BUILDING HISTORY ................... 7

REGIONAL DATA ................................................... 8

REGIONAL MAP .................................................... 12

CITY & NEIGHBORHOOD DESCRIPTION ............... 13

LOCATION MAP .................................................... 15

ZONING ................................................................ 16

SITE DESCRIPTION................................................ 17

FLOOD MAP ......................................................... 18

PLAT MAP ............................................................ 19

AERIAL VIEW ........................................................ 20

DESCRIPTION OF IMPROVEMENTS........................ 21

SUBJECT PHOTOGRAPHS ..................................... 22

HIGHEST AND BEST USE ....................................... 26

### Valuation

INCOME APPROACH ............................................... 29

COST APPROACH .................................................... 29

SALES COMPARISON APPROACH .......................... 30

COMPARABLE SALES LOCATION MAP ................... 31

RECONCILIATION .................................................... 42

EXPOSURE TIME / MARKETING TIME .................... 42

DEFINITIONS........................................................... 43

ENVIRONMENTAL & STRUCTURAL ISSUES .......... 44

EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS ................................ 44

ASSUMPTIONS AND LIMITING CONDITIONS .......... 45

CERTIFICATION ....................................................... 47

CURRICULUM VITAE ............................................... 48

ADDENDA............................................................... 51

Report Type: Appraisal Report

## *SUMMARY OF IMPORTANT FACTS & CONCLUSIONS*



| | |
|---|---|
| **Location:** | 3990 Sunset Drive |
| **City / County / State:** | Spring Park / Hennepin / Minnesota |
| **Appraisal Report:** | Appraisal Report |
| **Current Use:** | Triplex on Lake Minnetonka |
| **Extraordinary Assumptions:** | Yes, see rear of report for standard assumptions |
| **Hypothetical Conditions:** | No, see rear of report |
| **Site Area:** | 15,682 SF (0.36 acres) |
| **Lake Front Footage:** | 107' (per aerial GIS measurement) |
| **Building Improvements:** | Single family home (converted to a triplex) |
| **Current Zoning:** | R1, Single and Two Family Residential |
| **Highest & Best Use:** | Redevelop with good quality single family home |
| **Personal Property:** | No personal property included |
| **Property Rights Appraised:** | Fee Simple |
| **Cost Approach:** | **Not Applied** |
| **Income Approach:** | **Not Applied** |
| **Sales Comparison Approach:** | **$640,000** |
| **Final Value Opinion:** | **$640,000** |

1

Report Type: Appraisal Report

## *INTRODUCTION*

This appraisal reflects the data found and the conclusions from an appraisal of a property located 3990 Sunset Drive, Spring Park, Minnesota.

The subject is a residential triplex located on Lake Minnetonka with 107' of lake frontage. Lake Minnetonka is one of the most popular recreational lakes in the Twin Cities metropolitan area. The building has a gross living area (GLA) of 2,631 SF; there is no basement. Based on an exterior inspection and a viewing of interior photos (on MLS), the house is dated and is considered to be in fair to average condition.

Currently, the home is rented to three tenants. Additionally, the subject has two boat split rights, which the property owner leases out as well. See page 7 for the current rents as reported by the owner.

**Methodology:** The current income generated by renting the subject indicates a value substantially less than the underlying land value. Given the dated condition of the improvements and the propensity of buyers to build new homes on Lake Minnetonka, the highest and best use of the subject is considered to be to redevelop the site with a single family home. As such, the subject will be valued as vacant land. Similar comparables with redevelopment potential as well as vacant lot sales will be used to determine an overall value opinion. The most common valuation unit is the price per front foot, which will be used in the Sales Comparison Approach.

Report Type: Appraisal Report

## VALUE TYPE, CONDITION & STABLILITY OF PROPERTY

| Type of Value: | This report provides an opinion of **Market Value**. |
|---|---|
| Condition of Value: | This report provides an **As Is Value.** |

## INTENDED USE OF THE APPRAISAL

The named client (see front of report) intends to use the appraisal for **to assist in bankruptcy court proceedings.**  Current market value will be determined.

This appraisal assignment was requested by the named client for its **sole use**.  No party, other than the client, may use or rely upon any part of this report without the prior written authorization of both the named client and the appraiser.  This report is not valid unless it contains the original signatures in blue ink.  Any unauthorized third party relying upon any portion of this report does so at its own risk.

## DATE OF APPRAISAL

| Effective Date: | August 7, 2014 |
|---|---|
| Inspection Date: | August 7, 2014 |
| Working Days of Report: | August 6 – 11, 2014 |

*Nagell Appraisal & Consulting, Inc.* **has not** *previously provided appraisal services on the subject property within the previous three (3) years.*

3

Report Type: Appraisal Report

## *SCOPE OF THE APPRAISAL REPORT*

**USPAP defines Scope of Work as: The type and extent of research and analyses in an assignment.**

For each appraisal, appraisal review and appraisal consulting assignment, an appraiser must:

  *1) Identify the problem to be solved,*
  *2) Determine and perform the scope of work necessary to develop credible assignment results; and*
  *3) Disclose the scope of work in the report.*

| | |
|---|---|
| 1) | Provide a reasonably supported value opinion as it relates to the intended use & scope. |
| 2) | Per assignment request (see addenda for engagement letter), the following degree of research and analysis has been made.  The narrative format used is an **Appraisal Report**, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2 of USPAP.  See individual approaches for further detail. |
| 3) | **The scope of work for this appraisal includes:**<br><br>• **a)** *Property Identification:*  Public record, plat maps, zoning maps and aerial photographs were used to identify the subject property.<br><br>• **b)** *Property Inspection:*  <u>A viewing of the subject exterior (interior viewed from photos from MLS) and neighborhood by the appraiser.</u>  Owner was not able to provide interior access in a timely manner. *Physical factors:* Based on property viewing and conversations with the client, city and county officials. Lot size is based on county information.  *Economic Factors:* Consisted of gathering of information from market experts, city and/or county offices, and internet about the region, community, neighborhood, zoning, utilities, and any pending projects in the area that may affect the subject property.<br><br>• **c)** *Extent of Data Researched:*  Sales data of competing properties within the subject market area were given primary consideration.  The most relevant data is used in this report.  Sources include, appraiser data files, assessor, internet, developers, agents, MLS, periodicals, in-office library, etc.  In addition, during the course of appraisal practice and of this appraisal process, the appraiser has had ongoing discussions with market participants (buyers, sellers, property managers, real estate agents/brokers, appraisers, etc.) and/or viewed market data in relation to how the current real estate market may impact the subject value.  The appraiser has not researched the title or ownership records.<br><br>• **d)** Type and Extent of Analysis Applied at Opinions or Conclusions:  An extensive review of market data was performed.  The most recent, similar and proximate data has been used.  The data used will be adjusted on a grid.  Reasonable and appropriate collection, verification, analysis and viewing has been performed in the valuation approaches, given the purpose and intended use of the report.  A final value opinion will be discussed and correlated. |

The data used was obtained from sources considered credible, yet its accuracy is not guaranteed.  If any of the above information is found to be otherwise the value could differ.

4

Report Type: Appraisal Report

## *PROPERTY RIGHTS APPRAISED*

Real property ownership consists of a group of distinct rights.  There are two primary property rights, Fee Simple and Leased Fee (as defined by The Appraisal of Real Estate, 13 Edition, Appraisal Institute).

**Fee Simple Interest:**  Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

> Note:  This would typically reflect an owner-occupied property.  When the property rights appraised are the unencumbered fee simple interest of the real estate, the appraised value is subject to normal easements for drainage, public streets and utilities, if any.  The effect of any existing mortgage or delinquent taxes on the subject property has not been considered in this appraisal.

**Leased Fee Interest:** The ownership interest held by a lessor (landlord), which includes the right to the contract rent specified in the lease plus reversionary right when the lease expires.  The lessor's interest in a property is considered a leased fee interest regardless of the duration of the lease, specified rent, the parties to the lease, or any of the terms in the lease contract.

> A leased property, even one with rent that is consistent with market rent, is appraised as a leased fee interest, not as fee simple interest.  Even if the rent of lease terms are not consistent with market terms, the lease fee interest must be given special consideration and is appraised as a leased fee interest *(The Appraisal of Real Estate, 13th Edition, Page 114).*

**Given the scope of the assignment, appraised value reflects *fee simple interest.***

## *PROPERTY COMPONENTS APPRAISED*

**Real Estate:** Appraised value reflects real estate only.

> The sales comparison approach will be applied.

**Furniture Fixtures and Equipment:** Not included.

**Business Value:**  No other Business Value is included.

Report Type: Appraisal Report

## IDENTIFICATION

| | |
|---|---|
| **Address:** | 3990 Sunset Drive<br>Spring Park, MN 55384 |
| **County PID:** | 17-117-23-33-0025 |
| **Legal:** | Municipality: SPRING PARK<br>Addition Name: SKARP & LINDQUISTS HAZELDELL ADD MTKA<br>Lot:<br>Block:<br>LOT 13 ALSO LOT 26 TOGO PARK LAKE MTKA |
| **Fee Owner:** | Donald A Driggs |
| **Census Tract #:** | 0272.03 |

## REAL ESTATE TAXES

| Taxes, per County Records | | |
|---|---|---|
| | **Payable 2014** | **Payable 2015** |
| Tax | $7,189.54 | n/a |
| *Tax ratio* | *1.4%* | *n/a* |
| Special Assessments/Solid Waste Fee/Other | <u>$0</u> | <u>n/a</u> |
| Total Tax & Assessments: | $7,189.54 | n/a |
| Delinquent taxes: | None noted | |
| **COUNTY ASSESSOR'S VALUE** | | |
| | **Payable 2014** | **Payable 2015** |
| Land | $514,000 | $514,000 |
| Building | <u>$1,000</u> | <u>$100,000</u> |
| **TOTAL** | **$515,000** | **$614,000** |

| Typical Tax Ratios by Property Type | |
|---|---|
| Commercial (retail, office, industrial, hotel, other, etc.) | 1.5% – 3.5% |
| Residential (multi-family, apartment, etc.) | 0.9% – 1.5% |
| Single-family dwellings | 0.8% – 1.5% |

The appraised value given in this report assumes any/all special assessments, and/or liens are paid in full and that there are no delinquent taxes, fees, payments, association dues, etc.   Should it be found that any of these exist the amount should be deducted from the appraised value.  Appraiser did not research these items; typically, a title search would reveal any of these.

Report Type: Appraisal Report

## *SUBJECT SALES & BUILDING HISTORY*

<table>
<tr><td rowspan="12">Sales History:</td><td rowspan="4">Current Listing</td><td>List Price:</td><td>n/a</td></tr>
<tr><td>List Date:</td><td>n/a</td></tr>
<tr><td>Source:</td><td>MLS, public listing sources</td></tr>
<tr><td>Comments</td><td>The subject is not currently listed for sale.</td></tr>
<tr><td rowspan="7">Prior Sale</td><td>Sale Price:</td><td>n/a</td></tr>
<tr><td>Sale Date:</td><td>n/a</td></tr>
<tr><td>Buyer:</td><td>n/a</td></tr>
<tr><td>Seller:</td><td>n/a</td></tr>
<tr><td>Terms:</td><td>n/a</td></tr>
<tr><td>Source:</td><td>County records, Plat Systems</td></tr>
<tr><td>Prior Sales:</td><td>No known or reported sales were found within the past **3 yrs.**</td></tr>
</table>

| Building History: | The subject was built in 1910 and has 2,631 SF of GLA (per old appraisal provided by owner). |
|---|---|

| **Lease:** | The subject is rented. Reportedly the rent rates are (per client):<br><br>• Main level 1-bedroom unit: $750 per month<br>• Main level 2-bedroom unit: $1,250 per month<br>• Upper level 1-bedroom unit: $895 per month<br><br>The tenants pay electricity and gas.<br><br>Additionally, there are two slips that rent for $2,500 each per boating season. |
|---|---|
| **Leasehold Interest:** | None noted, the leases are relatively short term and are near market rates |
| **Association Dues:** | None |

7

Report Type: Appraisal Report

## REGIONAL DATA

### Metro Area

Minneapolis-Saint Paul is the most populous urban area in Minnesota, and is composed of 186 cities and townships.  Built around the Mississippi, Minnesota and St. Croix rivers, the area is also nicknamed The Twin Cities for its two largest cities, Minneapolis and Saint Paul.  Saint Paul is the second largest city in Minnesota, as well as the state capital.

The area is part of a larger U.S. Census division named Minneapolis-St. Paul-Bloomington, MN-WI, the country's 16th-largest metropolitan area, composed of eleven counties in Minnesota and two counties in Wisconsin.  This larger area, in turn, is enveloped in the U.S. Census combined statistical area called Minneapolis-St. Paul-St. Cloud, MN-WI with an estimated population of 3.5 million people in 2006, ranked the 13th most populous in the U.S.

In both of the fully developed central cities–Minneapolis and St. Paul–the population has declined due to smaller household sizes, yet growth in other areas of their counties has been more than offsetting.  Below is detailed where this growth has occurred:

| County | Census 2000 | Census 2010 | Forecast 2015 | Growth 2000 - 2010 | | Growth 2010 - 2015 | |
|---|---|---|---|---|---|---|---|
| | | | | *total* | *annual* | *total* | *annual* |
| **Hennepin** | **1,116,200** | **1,152,425** | **1,165,830** | **3.25%** | **0.32%** | **1.16%** | **0.12%** |
| Ramsey | 511,035 | 508,640 | 491,820 | -0.47% | -0.05% | -3.31% | -0.33% |
| Dakota | 355,904 | 398,552 | 437,520 | 11.98% | 1.20% | 9.78% | 0.98% |
| Anoka | 298,084 | 330,844 | 374,350 | 10.99% | 1.10% | 13.15% | 1.32% |
| Washington | 201,130 | 238,136 | 257,760 | 18.4% | 1.84% | 8.24% | 0.82% |
| Scott | 89,498 | 129,928 | 186,820 | 45.17% | 4.52% | 43.79% | 4.38% |
| Wright | 89,986 | 124,700 | 159,640 | 38.58% | 3.86% | 28.02% | 2.80% |
| Carver | 70,205 | 91,042 | 114,870 | 29.68% | 2.97% | 26.17% | 2.62% |
| Sherburne | 64,417 | 88,499 | 119,040 | 37.38% | 3.74% | 34.51% | 3.45% |
| Chisago | 41,101 | 53,887 | 67,880 | 31.11% | 3.11% | 25.97% | 2.60% |
| *Total* | *2,837,560* | *3,116,653* | *3,375,530* | *9.84%* | *0.98%* | *8.31%* | *0.83%* |

*Table title: POPULATION.  Source: US Census Bureau*

Overall, the area has experienced moderate to good income growth.  Annualized income growth of 2.5% to 3.5% is consistent with national averages.

| County | Census 2010 | Estimate 2011 | Growth 2010 - 2011 | |
|---|---|---|---|---|
| | | | *total* | *annual* |
| **Hennepin** | **59,236** | **60,817** | **2.7%** | **2.7%** |
| Ramsey | 50,136 | 51,702 | 3.1% | 3.1% |
| Dakota | 69,508 | 69,902 | 0.6% | 0.6% |
| Anoka | 65,771 | 63,614 | -3.3% | -3.3% |
| Washington | 77,239 | 76,491 | -1.0% | -1.0% |
| Scott | 77,314 | 80,864 | 4.6% | 4.6% |
| Wright | 66,833 | 68,242 | 2.1% | 2.1% |
| Carver | 80,173 | 83,348 | 4.0% | 4.0% |
| Sherburne | 69,971 | 67,198 | -4.0% | -4.0% |
| Chisago | 63,810 | 63,959 | 0.2% | 0.2% |

*Table title: MEDIAN HOUSEHOLD INCOME.  Source: US Census Bureau*

Report Type: Appraisal Report

Regional Data – continued

**Economic Trends**

The current residential interest rates for a typical 30-year mortgage are around 4.0% to 5.0%. Commercial rates are around 4.5% to 6.0%. Rates are expected to be relatively stable for the foreseeable future.

The state of the macro economy (national, state, etc.) declined from its peak in 2006, but in 2010 began showing signs of recovery. Many economists are terming 2007 through 2009 as *"The Great Recession".*

New construction labor costs have softened, however, material costs appear to be rising. Overall, construction costs are very competitive to what they were 5 to 6 years ago. Generally, when vacancy is over 10%, new construction is slow. *Generally vacancy and capitalization rates were on the rise during the "Great Recession" but are now showing signs of stabilizing.*

Listing prices have been declining from the peak of the market in 2006 which was a period of high seller expectations. Recently seller expectations and value appear to be trending towards equilibrium. However, there are still numerous properties with list prices that are above market norms, resulting in lengthy marketing times. Appropriately priced properties continue to reflect marketing times similar to historic norms (under 1 year typical).

Although well diversified, the TCMA and surrounding Minnesota economy is not immune to the recent soft/declining trends of the overall economy.



*Source: Minnesota DEED*

Minnesota's index plunged along with the national index during the worst months of the recession but bottomed out earlier and dropped less than the national index. Minnesota's economy seems to be emerging quicker and stronger than the national recovery.

9

Report Type: Appraisal Report

Regional Data – continued



Over the past ten years, unemployment rates have gone from near historical lows in 1999 to at/near historical highs by year end 2009. Currently, unemployment is nearing pre-recession values.



According to the Minnesota Department of Employment and Economic Development, the April 2014 unemployment rate for Minnesota was 4.7% (seasonally adjusted).

10

Report Type: Appraisal Report

Regional Data – continued



**2013 Annual Report on the Twin Cities Housing Market**

## Quick Facts

Rankings include geographies with 15 sales or more. County totals are not included.











11

Report Type: Appraisal Report

## *REGIONAL MAP*



Report Type: Appraisal Report

## *CITY & NEIGHBORHOOD DESCRIPTION*

| | | | |
|---|---|---|---|
| **Type of neighborhood:** | Western suburban community | | |
| **Percent built-up:** | 90% developed | | |
| **Stage of Development:** | Stable with redevelopment on the lake | | |
| **Neighborhood boundaries:** | Area around Lake Minnetonka | | |
| **Major Transportation:** | County Road 15, County Road 19 | | |
| **Predominant type & conformity:** | *Single Family Residential* | | *75%* |
| | *Two- & Multi-Family* | | *5%* |
| | *Commercial/Industrial* | | *10%* |
| | *Other/Vacant Land* | | *5%* |
| | *Total:* | | *100%* |
| | Average conformity. | | |
| **Reputation of the area:** | Good | | |
| **Typical property age:** | New to 80+ years, predominant under 30 years | | |
| **Single-Family Home Sales:** | $400,000 to $1,000,000+ | | |
| **Lake Front Lot Sales** | $3,500 to $10,000 + per Front Foot | | |
| **Apartment Sales:** | $30,000 to $80,000+ per unit | | |
| **Office Property Sales:** | $75 to $150+ per SF | | |
| **Retail Property Sales:** | $75 to $200+ per SF | | |
| **Industrial Property Sales:** | $40 to $80+ per SF | | |
| **Capitalization Rates:** | 7-10% Historic | | |
| **Subject Market:** | Strong on the lake | | |
| **Neighborhood Trend:** | Stable with gradual increase in values over time | | |
| **Detrimental influences:** | No major apparent | | |

**City:**  The City of Spring Park is a western suburban community about 30 minutes from Downtown Minneapolis and is adjacent to Lake Minnetonka. Spring Park has good appeal due to its proximity to Lake Minnetonka, Downtown Minneapolis and access to surrounding communities.  Access to the area is considered good, as there are a number of major roads that run through city.  Major shopping is mostly to the east and is within 10 to 15 minutes.

**NEIGHBORHOOD:**  The subject is located on Lake Minnetonka on the West Arm, one of the most popular suburban lakes in the Twin Cities area. The immediate area is mostly single family residential, with some commercial and retail to the southwest. The area has a very good reputation.

13

Report Type: Appraisal Report

City & Neighborhood Description -- continued

**Subject County & City:** The subject is located in the western portion of Hennepin County in Spring Park.

As of the 2010 census, Spring Park had a population of 1,669 people. In 2000, Spring Park had a population of 1,717. The 2000 to 2010 decrease is 48 people or 2.8%.

**Median Home Prices & Sales Volume by Year:  Spring Park**
*Source:  NorthstarMLS Stats*



The sales chart above shows activity in Spring Park, however the amount of sales is not enough to form a reliable median.

14

Report Type: Appraisal Report

## *LOCATION MAP*



Report Type: Appraisal Report

## *ZONING*



| Subject Zoning: | **R-1, Single and Two Family Residential** |
|---|---|
| **Intent (per code):** | The purpose of the R-1, Single and Two-Family Residential district is to provide for low- and moderate-density one-and two-unit dwellings and directly related, complementary uses. |
| **Permitted Uses:** | Single-family detached dwelling units; two-family dwelling units; essential services. |
| **Major Restriction/ requirements in this district:** | Minimum lot area: 10,000 SF; Front Yard Setback: 30' from city public right-of-way; Side Yard Setbacks: no less than 10'; Rear yard setback: no less than 10'; Ordinary high-water mark setback: no less than 50'<br><br>**Note:** City administrator Dan Tolsma confirmed the ordinary high-water mark setback |
| **Use:** | Based on the zoning code the triplex use is non-conforming and is assumed to be a grandfathered in use. |
| ***Source:*** | City zoning code website. |

16

Report Type: Appraisal Report

## *SITE DESCRIPTION*

| | |
|---|---|
| **Dimensions:** | Mostly Rectangular, see plat |
| **Site Area:** | 15,682 SF (0.36 acres), per county |
| **Topography/Shape:** | Level / Mostly Rectangular / Average |
| **Drainage:** | Assume Adequate |
| **Utilities:** | |
| Electricity/Gas: | Adequate |
| Water/Sanitary Sewer: | City Water and City Sewer |
| **Off-Site Improvements:** | |
| Street/Curb-gutter: | Paved / Yes, concrete |
| Sidewalk / Alley: | None / Yes, paved, used as a boat ramp |
| Street Lights: | Average |
| Storm Sewer: | None, surface |
| **Access to site:** | Sunset Drive via alley |
| **Frontage:** | Sunset Drive |
| **Traffic:** | Average |
| **Front Feet (lakeshore):** | About **107'** per owner and GIS measurement and county lot dimensions |
| **Flood hazard zone:** | See map on following page |
| **Apparent easements:** | Typical drainage and utility |
| **Encroachments:** | None apparent |
| **Unusual conditions:** | None apparent |
| **Current Use:** | Residential Triplex |
| **Zoning:** | R-1, Single and two family residential |
| **Surplus/excess land:** | None |

| **Surrounding uses:** | N: | Residential | S: | Boat ramp, residential |
|---|---|---|---|---|
| | E: | Residential | W: | Residential |

| | |
|---|---|
| **Distance to major road:** | Direct access to Sunset Drive, about 0.25 miles south to County Road 15 |

**Comments:**  The subject is a residential lot and the surrounding uses are mostly residential. The site has average tree coverage. Site does not appear to be conducive for a basement.

Boat landing adjoins the subject to immediate southwest, appears to be minimally used given the narrow design.

17

Report Type: Appraisal Report

## FLOOD MAP



Report Type: Appraisal Report

## PLAT MAP



Report Type: Appraisal Report

## *AERIAL VIEW*



*Outline approximate

Report Type: Appraisal Report

## *DESCRIPTION OF IMPROVEMENTS*

| Type of Construction | |
|---|---|
| **Design:** | Two-story residential (triplex) |
| **Year Built:** | 1910 (per county records) |
| **Structure:** | Wood frame |
| **Roof Surface:** | Shake roof |
| **Exterior Walls/Windows:** | Wood siding / Casement, Double hung |
| **Interior** | |
| **GLA (above grade only):** | 2,631 SF / Room Count 9 – 4 – 3 |
| **Ceiling/Walls:** | Average |
| **Floors/Lighting:** | Wood, carpet / Average |
| **Doors/Trim:** | Wood / Wood |
| **Bathrooms:** | 3 |
| **Kitchen:** | Wood cabinets |
| **Basement/Basement Finish:** | None |
| **Garage:** | None |
| **Other:** | Small storage building, appears to be in fair condition |
| **Mechanical/Plumbing/Insulation** | |
| **Heating/Cooling:** | Gas forced air / Wall AC units |
| **Electrical/Plumbing:** | Adequate / Copper |
| **Hot water Heater/Sump Pump:** | Average / N/A |
| **Insulation:** | Assumed average, concealed |
| **Depreciation** | |
| **Effective Age:** | 50 years |
| **Est. Remaining Economic Life:** | 5 years |
| **Physical:** | Normal wear and tear due to aging. |
| **Functional:** | None, functional layout. |
| **External:** | Yes—cost and value are not presently equal. |

**Comments:** The subject property is dated and is considered to be in fair to average condition based on an external viewing. The interior file photos from MLS show the interior to be in average condition.

21

Report Type: Appraisal Report

## *SUBJECT PHOTOGRAPHS*



Looking south on Sunset Drive



Looking north on Sunset Drive



Looking east on alley



Front view

22

Report Type: Appraisal Report

Subject Photographs – Continued



Rear view



Storage building



Lake / dock view



Interior (MLS photo)

Report Type: Appraisal Report

Subject Photographs – Continued



Interior (MLS photo)



Interior (MLS photo)



Interior (MLS photo)



Interior (MLS photo)

Report Type: Appraisal Report

Subject Photographs – Continued



Interior (MLS photo)



Interior (MLS photo)



Interior (MLS photo)



Interior (MLS photo)

Report Type: Appraisal Report

## HIGHEST AND BEST USE

Highest and best use as defined in The Appraisal of Real Estate, Thirteenth Edition, by the Appraisal Institute, is:  "The reasonably probable and legal use of vacant land or an improved property, that is physically possible, legally permissible, appropriately supported, financially feasible, and that results in the highest value."

Highest and best use is analyzed in two ways, site as vacant and site as improved.

| Typically, there are four criteria in highest and best use analysis | |
|---|---|
| Legally permissible uses | What uses are allowed by zoning? |
| Physically possible uses | What uses are physically possible on the site? |
| Financially feasible use | Which possible and permissible uses will produce a positive return? |
| Maximally productive use | Of the financially feasible uses, which use produces the highest return warranted by the market (the ideal improvements)? |

**Site as Vacant:**  Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital, and coordination.  The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements.  The Dictionary of Real Estate Appraisal, Fifth Edition, by the Appraisal Institute.

**Legally Permissible Uses:**  The current zoning allows for single and two family residential related uses.

**Physically Possible Uses:**   The physical characteristics of the site appear suitable for residential development. The site has 107' of lake front on Lake Minnetonka, one of the most popular recreational lakes in the Twin Cities area. Additionally, the lot is one of the larger sites in the immediate area. Water and sewer utilities are public. The site has average access. The site will allow for a number of potential residential uses.

**Note:** The city zoning mandates a setback of at least 50' from the ordinary high water mark. Given the subject's width and depth there appears to be a substantially large (for the area) buildable area.

**Financially Feasible Uses:**  Typically, surrounding uses, market demand, and availability of financing drive financially feasible uses.

> **Surrounding Uses:** Most uses in the immediate subject area are residential related. Based on surrounding uses, a residential use would be supported.

> **Financing:**  Over the past 2+ years, financing has loosened up since the "Great Recession". However, borrowers typically must be well qualified with 20% to 30% down, especially for high value projects. Rates are still near historic lows.

> **Market Demand:** Residential demand is strong in the subject area, especially for single family properties located on Lake Minnetonka. Due to the scarcity of vacant lots on the lake, it is common for sites with older homes to be purchased, razed, and redeveloped. Market demand for single family is considered to be good.  Demand for standalone duplex use on the lake is virtually nil, this is likely due to that rent rates (see following section) are not high enough to warrant building a two unit and there are so few on the lake.

**Maximally Productive Use:**  The surrounding uses and physical characteristics of the subject would support a single family residential use. Therefore the highest and best use is considered to be for single family residential development.

26

Report Type: Appraisal Report

## Highest and Best Use – continued

**Site as Improved:**  The use that should be made of a property as it exists.  An existing improvement should be renovated or retained as so long as it continues to contribute to the total market value of the property, or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one.   *The Dictionary of Real Estate Appraisal, Fifth Edition, by the Appraisal Institute.*

**Legally Permissible Uses:**  The subject's existing use appears to be non-conforming but grandfathered in; if found to be otherwise the appraised value could differ. There are no other known or reported legality or conformance issues for the subject property that could restrict the current use on an ongoing basis.  If found otherwise, the value opinion could differ.

**Physically Possible Uses:**  The existing building is suited to the subject site; however it appears to be within the allowable setback. Utilities are public and are reportedly connected to the home. The site is one of the larger sites in the area and would allow for a larger home. Additionally, the site has 107' of front footage on Lake Minnetonka. The triplex improvements are in fair to average condition.

The existing building improvements appear to be nearing the end of their economic life. Given current age and condition of the improvements, in addition to land values in the area, redevelopment of the subject site is considered a viable option at this time.

**Financially Feasible Uses:**

    **Surrounding Uses:**  Surrounding uses support and compliment a residential related use.

    **Market Demand:**   Demand for residential properties located on Lake Minnetonka is rated to be good.

    **Property History / Performance:** The subject has functioned as a triplex for some time. The following illustrative analysis shows an indication of price based on the existing income (rents per owner):

| | |
|---|---|
| Total Monthly Rent: | $2,895 |
| Total Annual Rent: | $34,740 |

| | |
|---|---|
| Gross Income: | $35,000 rnd |
| Less Vacancy (5%): | ( $1,700) rnd |
| **Effective Gross Income:** | **$33,300** |

An expense ratio of **45%** is assumed which covers land lord expenses (maintenance, trash, insurance, taxes, etc. as well as management and reserves for replacement/repairs)

| | |
|---|---|
| **Less Expenses (45%):** | ($14,985) |
| **Net Operating Income (NOI):** | $18,315 |

In addition to the rental income, the owner also leases two slips at $2,500 per year ($5,000 total per year). Expenses for the slip are assumed to be 20%, which covers for vacancy, dock repair, management, and removing and putting in the docks every winter and spring.

| | |
|---|---|
| Dock Gross Income: | $5,000 |
| Less Expenses (20%): | ($1,000) |
| Dock NOI: | $4,000 |

The overall total Net Operating Income for the property is $18,315 + $4,000 = $22,000 rnd. per year. Applying a capitalization rate of 8.0% yields an indicated value of:

$22,000 income / 8.0% cap rate = **$275,000 rnd.**

27

Report Type: Appraisal Report

Highest and Best Use – continued

### Financially Feasible Uses – Continued

**Financing:**  Financing is available for well qualified borrowers.

**Maximally Productive Use:** A seller/buyer would likely consider the following:

1.  **Continue the current triplex use.** The subject is currently used as a triplex. The yearly income that is generated by the property is about $22,000, which indicates a price of $275,000. This indicated price is clearly well below the land value; this option does not appear to be logical.

2.  **Convert the home to single family residential.** The home is in fair to average condition and the layout is currently for three tenants (separate kitchens). Given the costs to update the home as well as to convert the home to a single family use, converting to a single family use does not appear to be logical, especially given the underlying land value.   Conversion to a single family home may not be allowed as the improvements are within the setback.

3.  **Raze and redevelop as single family residential.** This option is viable and market demand is rated to be good for single family residential properties on Lake Minnetonka. The site would allow for a substantial home.   See following land sales analysis for land value support which is substantially higher than the current triplex use.

Based on the above options, Option 3 appears to be the most logical. Option 1 is a good interim use until redevelopment occurs with repairs to the home as needed. Any costs associated with razing are offset by the income generated. Therefore the highest and best use would be to raze the existing home and redevelop the site for a single family use as market demand warrants and zoning allows.

Report Type: Appraisal Report

## INCOME APPROACH

The Income Approach was not applied to determine land value as residential lots are typically not rented out in the market. Because of the lack of data, the Income Approach is not deemed a reliable indicator to the land value and is therefore not applied.

**Note:** As shown in the highest and best use, the existing income generated by the property indicates a value of $275,000, which is below the land value.

## COST APPROACH

The Cost Approach is not applicable in this situation since the building improvements are not included in the appraised value.

Report Type: Appraisal Report

## *SALES COMPARISON APPROACH*

The Sales Comparison Approach to Value is predicated upon sales of properties with similar characteristics as the subject.  The primary premise of this approach is that the market value of the subject is directly related to the prices of competing properties after adjustment.  Adjustments are made in an effort to account for significant differences.

**Land Value:**  Land value is estimated as if the land were vacant and available for development to its highest and best use.  There are several different methods to analyze site values: sales comparison, allocation, extraction, subdivision development, land residual, and ground rent capitalization.  One or more of these methods may be applicable depending on market conditions and the type of land.

The preferred and most reliable approach is the sales comparison; however, when sales data is very limited, some of the other methods may be employed if appropriate data is available.  **For purposes of this appraisal, the sales comparison method has been utilized.**

### **The Following Outline Is Used In The Sale Comparison Approach:**

- A location map of the comparable sales.

- Comparable sales are listed.

- An adjustment grid using the comparable sales.

- A discussion of adjustment and conclusion of value.

**Allocation:** A method of estimating land value in which sales of improved properties are analyzed to establish a typical ratio of land value to total property value and this ratio is applied to the property being appraised or the comparable sale being analyzed.

**Source:  Dictionary of Real Estate Appraisal, Fifth Edition, Appraisal Institute**

**Methodology:** As noted, the subject will be valued on a front foot basis, which is common on lake properties.

Report Type: Appraisal Report

## COMPARABLE SALES LOCATION MAP



**Scope of Search:** Similar lots located near the subject. The search area has been expanded as there are limited vacant lot sales in the subject area as the subject market is mostly built-up; redevelopment sites are also considered.

31

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 1 | |
|---|---|
|  |  |

| | |
|---|---|
| **Location:** | 2490 Carman Street, Orono |
| **Use:** | Residential Lot |
| **Legal/PID:** | 20-117-23-12-0010 |
| **Site SF:** | 19,166 SF |
| **Building Improvements:** | None |
| **Frontage:** | 98', per site dimensions and aerial gis |
| **Shore:** | Average |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | June 20, 2014 |
| **Price:** | $800,000 |
| **Comments:** | Residential lot that was vacant at the time of sale. Property was listed on the open market. |
| **Price per Unit:** | **$8,163 per FF** |

32

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 2 | |
| --- | --- |
|  |  |

| | |
| --- | --- |
| **Location:** | 1161 Elmwood Avenue, Orono |
| **Use:** | Residential Lot |
| **Legal/PID:** | 07-117-23-14-0029 |
| **Site SF:** | 12,197 SF |
| **Building Improvements:** | None |
| **Frontage:** | 50', per site dimensions and aerial gis |
| **Shore:** | Average |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | August 20, 2013 |
| **Price:** | $327,500 |
| **Comments:** | Residential lot that was vacant at the time of sale. Property was listed on the open market. |
| **Price per Unit:** | **$6,550 per FF** |

33

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 3 | |
|---|---|

 

| | |
|---|---|
| **Location:** | 1340 Rest Point Circle, Orono |
| **Use:** | Residential Lot |
| **Legal/PID:** | 07-117-23-31-0021 |
| **Site SF:** | 19,564 SF |
| **Building Improvements:** | Average |
| **Frontage:** | 90', per site dimensions and aerial gis |
| **Shore:** | Average |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | September 20, 2013 |
| **Price:** | $539,000 - $5,000 seller points = $534,000 sale price |
| **Comments:** | Agent noted that the home is possible for tear-down. Property was listed on the open market. |
| **Price per Unit:** | **$5,933 per FF** |

34

Report Type: Appraisal Report

Sales Comparison Approach – continued

| **LAND COMPARABLE 4** | |
| --- | --- |
|  |  |

| | |
| --- | --- |
| **Location:** | 3926 Cherry Avenue, Orono |
| **Use:** | Residential Lot |
| **Legal/PID:** | 08-117-23-33-0019 |
| **Site SF:** | 23,955 SF |
| **Building Improvements:** | Average |
| **Frontage:** | 66', per site dimensions and aerial gis |
| **Shore:** | Average |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | May 27, 2014 |
| **Price:** | $700,000 |
| **Comments:** | Agent noted that the home is possible for tear-down. Property was listed on the open market. |
| **Price per Unit:** | **$10,606 per FF** |

35

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 5 | |
|---|---|
|  |  |

| | |
|---|---|
| **Location:** | 1657 Dove Lane, Mound |
| **Use:** | Residential Lot |
| **Legal/PID:** | 07-117-23-14-0029 |
| **Site SF:** | 12,427 SF |
| **Building Improvements:** | Average |
| **Frontage:** | 80', per site dimensions and aerial gis |
| **Shore:** | Fair |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | April 15, 2014 |
| **Price:** | $339,500 |
| **Comments:** | Residential home with redevelopment potential. Property was listed on the open market. |
| **Price per Unit:** | **$4,244 per FF** |

36

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 6 | |
|---|---|

 

| Location: | 6385 Bay Ridge Road, Mound |
|---|---|
| Use: | Residential Lot |
| Legal/PID: | 23-117-24-33-0023 |
| Site SF: | 49,905 SF |
| Building Improvements: | Average |
| Frontage: | 150', per site dimensions and aerial gis |
| Shore: | Average |
| Utilities: | Public |
| Source: | MLS |
| Terms: | Conventional |
| Date of Sold: | July 3, 2014 |
| Price: | $690,000 |
| Comments: | Residential home, dated, redevelopment potential. Agent noted potential to build new. Property was listed on the open market. |
| Price per Unit: | $4,600 per FF |

Report Type: Appraisal Report

Sales Comparison Approach – continued

| LAND COMPARABLE 7 |
|---|

 

| | |
|---|---|
| **Location:** | 4018 Sunset Drive, Spring Park |
| **Use:** | Residential Lot |
| **Legal/PID:** | 17-117-23-33-0029 |
| **Site SF:** | 4,620 SF |
| **Building Improvements:** | Average |
| **Frontage:** | 28', per site dimensions and aerial gis |
| **Shore:** | Average |
| **Utilities:** | Public |
| **Source:** | MLS |
| **Terms:** | Conventional |
| **Date of Sold:** | July 28, 2014 |
| **Price:** | $272,000 |
| **Comments:** | Assessor's ratio used. Payable 2014 land assessed value is $200,000 while the overall assessed value is $246,000. The assessor's land to assessed value ratio is $200,000 / $246,000 = 80% rnd. The sale price was $340,000 which indicates a land price of $340,000 x 80% = **$272,000**. Property was listed on the open market. |
| **Price per Unit:** | **$9,714 per FF** |

38

Report Type: Appraisal Report

## Sales Comparison Approach – continued

Listed below is the adjustment grid for the comparables.  Comparable items of significant difference are adjusted for on a price per square foot basis.

| Description | Subject | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Address | 3390 Sunset Drive Spring Park | 2490 Carman Street Orono | 1161 Elmwood Avenue Orono | 1340 Rest Point Circle Orono | 3926 Cherry Avenue Orono | 1657 Dove Lane Mound | 6385 Bay Ridge Road Mound | 4018 Sunset Drive Spring Park |
| Proximity | Subject | 0.66 mi SE | 1.2 mi N | 1.3 mi NW | 0.9 mi N | 1.6 mi NW | 3.25 mi SW | 4 lots S |
| Financing | Market | Market | Market | Market | Market | Market | Market | Market |
| Conditions | Typical | Typical | Typical | Typical | Typical | Typical | Typical | Typical |
| Sale Date | -- | Jun-14 | Aug-13 | Sep-13 | May-14 | Apr-14 | Jul-14 | Jul-14 |
| Location | Average | Average | Average | Average | Average | Average | Average | Average |
| Zoning/Use | Residential | Residential | Residential | Residential | Residential | Residential | Residential | Residential |
| Phys Char | Average | Average | Average | Average | Average | Average | Average | Average |
| Building Improvements | Fair to Average | None | None | Average | Average | Average | Average | Average |
| Front Frontage (FF) | 107 | 98 | 50 | 90 | 66 | 80 | 150 | 28 |
| Shore | Average | Average | Average | Average | Average | Fair | Average | Average |
| Utilities | Public | Public | Public | Public | Public | Public | Public | Public |
| Sale Price | -- | $800,000 | $327,500 | $534,000 | $700,000 | $339,500 | $690,000 | $272,000 |
| Site Size (SF) | 15,682 | 19,166 | 12,197 | 19,564 | 23,955 | 12,427 | 49,905 | 4,620 |
| **Price per FF** | | **$8,163** | **$6,550** | **$5,933** | **$10,606** | **$4,244** | **$4,600** | **$9,714** |
| **Cond. Adj.** | **+/-** | | | | | | | |
| Financing | Market | | | | | | | |
| Conditions | Typical | | | | | | | |
| Sale Date | -- | | | | | | | |
| **Net Cond. Adj.** | | **0%** | **0%** | **0%** | **0%** | **0%** | **0%** | **0%** |
| **Effective $/FF** | | **$8,163** | **$6,550** | **$5,933** | **$10,606** | **$4,244** | **$4,600** | **$9,714** |
| **Adjustments** | **+/-** | | | | | | | |
| Location | Average | | | | | | | |
| Zoning/Use | Residential | | | | | | | |
| Phys Char | Average | | | | | | | |
| Building Improvements | Fair to Average | | | | | | | |
| Front Frontage (FF) | 107 | | -10% | | -10% | -5% | 5% | -15% |
| Shore | Average | | | | | 10% | | |
| Utilities | Public | | | | | | | |
| Site Size (SF) | 15,682 | | | | | | | |
| **Net Adjustment** | | **0%** | **-10%** | **0%** | **-10%** | **5%** | **5%** | **-15%** |
| **Adjusted Price per FF** | | **$8,163** | **$5,895** | **$5,933** | **$9,545** | **$4,456** | **$4,830** | **$8,257** |

Report Type: Appraisal Report

Sales Comparison Approach -- continued

## Discussion of Adjustments

**Property Rights:** Refers to the ownership interest conveyed at the time of sale.  Properties with leases or other encumbrances in place can sell for more or less than comparable properties that sell fee simple interest.  The sale prices of the comparable properties were not impacted by existing lease terms (if any).

**Financing:**  The impact financing may have had on the sale price, favorable interest rate or term.  All sales were cash or estimated to be near or at market rates.

**Conditions of sale:**  Reflects non-market conditions, which may or may not have impacted the sale price, such as differing motivations of buyer or seller (related parties, distressed or liquidation sale, listings, pendings, occupancy, assemblage, etc.), impending eminent domain proceedings, influence due to tax ramifications, or lack of market exposure.

**Time of sale:** The comparable sales are all relatively recent, no time adjustment necessary.

**Location:**  This adjustment is based on the appraiser's judgment.  It takes into consideration surrounding land uses, intended use, neighborhood characteristics, traffic, exposure and access.  All have competing locations.

**Zoning/Use:**  Overall, the subject and comparables are rated similar.

**Physical Characteristics:**  Shape and topography adjustments reflect the market preference for rectangular and level parcels, which optimize development potential.

**Building Improvements:** Sites with existing buildings typically have interim value that off-sets the razing costs.  As such, no adjustments.

**Front Footage:** Adjustments recognize that smaller lots typically sell for more per FF than larger lots. Comparables 2, 4, 5, and 7 adjusted for less frontage. Comparable 6 adjusted for more frontage.

**Shore:** Comparable 5 adjusted for less appealing shoreline on small inlet.

**Utilities:**  Comparables have public utilities.

**Site Size:**  Adjustments recognize larger parcels of land typically sell for less per square foot than smaller sites. Comparables have competing site sizes.

40

Report Type: Appraisal Report

Sales Comparison Approach -- continued

**Conclusion:**  The comparables used are rated to be the most indicative of data analyzed and bracket the subject value.  Other sales reviewed were older, further and/or needed more adjustment.  Adjustments are made on a per front foot basis.   The comparables utilized in this analysis each have several similar characteristics in common with the subject.  While none are totally identical to the subject, each represents a viable alternative to a prospective buyer of the subject property and, after adjustment, can be utilized as an indicator of market value for the subject property.

| Indicator | **Un-adjusted** Price per FF | **Adjusted** Price per FF |
|---|---|---|
| Range | $4,244   -   $10,606 | $4,456   -   $9,545 |
| Average | $7,116 | $6,726 |
| Median | $6,550 | $5,933 |

Based on the subject characteristics, a rate near the lower mid-range is considered appropriate.

| Front Footage | Value per FF | Total |
|---|---|---|
| 107' | $5,600 | $599,200 |
| **Opinion of Value** | | **$600,000** |

41

Report Type: Appraisal Report

## RECONCILIATION

| | |
|---|---|
| **Indicated Value by Cost Approach:** | Not applied |
| **Indicated Value by Income Approach:** | Not applied |
| **Indicated Value by Sales Comparison Approach:** | $600,000 |

The **Cost Approach** was not utilized.

The **Income Approach** was not utilized, however and illustrative income is used in the Highest and Best Use applying the reported subject rents.

The **Sales Comparison Approach** to value analyzed recent sales as compared with the characteristics of the subject property.  Adjustments were made to the comparables to make them as similar to the subject as possible.  This results in an indication of market value at which a typical buyer would be willing to pay for the subject property.

**Conclusion:**  The Sales Comparison Approach is deemed to be the only reliable indicator of value because it represents the actions of buyers and sellers in the area for competing properties.  The indicated market value for the subject property is:

| | |
|---|---|
| **Final Opinion of Market Value** | **$600,000** |

*Changes in the market, building, use, lease, and/or management, etc., subsequent to the effective appraisal date could impact market value.*

## EXPOSURE TIME / MARKETING TIME

| **Reasonable Exposure Time:**  *Under one (1) year before the effective date of the appraisal.* | **Marketing Time Opinion:** *12 months or less after the effective date of the appraisal.* |
|---|---|

42

Report Type: Appraisal Report

## *DEFINITIONS*

**MARKET VALUE** - The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

 *(A) buyer and seller are typically motivated;*

 *(B) both parties are well informed or well advised, and each acting in what they consider their own best interest;*

 *(C) a reasonable time is allowed for exposure in the open market;*

 *(D) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

 *(E) the price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.*

**Source: Dictionary of Real Estate, Fifth Edition, 2010**

Report Type: Appraisal Report

## ENVIRONMENTAL & STRUCTURAL ISSUES

Regarding any adverse environmental and/or improvement structural conditions (such as, but not limited to, hazardous wastes, toxic substances, mold, construction defects or inadequacies, etc.) present in the improvements, on the site, or in the immediate vicinity of the subject property: **None are apparent**, however, appraiser is not an expert in this field.  Value assumes no hazardous or structural conditions exist.  Value assumes any abandoned wells will be/are properly sealed.  If any of these conditions exist the appraised value could differ significantly.

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

**As stated by USPAP;**

**Extraordinary Assumption:**  An assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions of conclusions.

**Appraised value assumes the subject condition is similar to that outlined in the report, based on an exterior inspection and MLS (as rental property).**

**Hypothetical Condition:**   That which is contrary to what exists but is supposed for the purpose of analysis.

**None**

44

Report Type: Appraisal Report

## *ASSUMPTIONS AND LIMITING CONDITIONS*

1.   The appraisers assume no responsibility for matters of a legal nature affecting the property appraised or the title thereto, nor do the appraisers render any opinion as to the title, which is assumed to be good and marketable.   The property is appraised as though under responsible ownership and good management.

2.  The furnished legal description is assumed to be correct.

3.  Any sketch in the report may show approximate dimensions and is included to assist the reader in visualizing the property.   The appraisers have made no survey of the property.   It is assumed unless otherwise noted that no survey has been viewed and that all improvements are located within the legally described property.

4. The appraisers are not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made therefore.

5.  The distribution of the total valuation in this report between land and improvements applies only under the reported highest and best use of the property.   The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.

6.   The appraisers assume that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.   The appraisers assume no responsibility for such conditions, or for engineering, which might be required to discover such factors.

7.  Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser.   The appraiser has no knowledge of the existence of such materials on or in the property.   The appraiser, however, is not qualified to detect such substances.   The presence of substances such as asbestos, urea-formaldehyde foam insulation, radon gas, or other potentially hazardous materials may affect the value of the property.   The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value.   No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.   The client is urged to retain an expert in this field, if desired.

8.   Information, estimates, and opinions furnished to the appraisers, and contained in the report, were obtained from sources considered reliable and believed to be true and correct.   However, the appraisers can assume no responsibility for accuracy of such items furnished the appraisers.

9.  Disclosure of the contents of the appraisal report is governed by the Bylaws and Regulations of the professional appraisal organizations with which the appraisers are affiliated.   No part of the contents of this report, or copy thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, reference to any professional appraisal organizations, or the firm with which the appraiser is connected), shall be disseminated to the public through advertising, public relations, news, sales, or any other public means of communications without the prior written consent and approval of the appraisers.

Report Type: Appraisal Report

Assumptions & Limiting Conditions – continued

10.  The appraisers have no present or contemplated future interest in the property appraised; and neither the employment to make the appraisal, nor the compensation for it, is contingent upon the appraised value of the property.  The appraisers have no personal interest or bias with respect to the parties involved.

11.  The appraiser has personally inspected the subject site.  To the best of the appraiser's knowledge and belief, all statements and information in this report are true and correct, and the appraisers have not knowingly withheld any significant information.

12.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is our personal, unbiased professional analyses, opinions, and conclusions.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

13.  The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of the property to determine whether or not it is in conformity with the various detailed requirements of the ADA.  It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act.  If so, this fact could have a negative effect upon the value of the property.  Since we have no direct evidence relating to this issue, we did not consider possible non-compliance with the requirements of ADA in estimating the value of the property.

14.  No one provided significant professional assistance to the person(s) signing this report.

15.  This appraisal assignment was not based on a requested minimum valuation or specific valuation or approval of a loan.

16.  To the best of our knowledge and belief, the reported analysis, opinions, and conclusions were developed, and this report was prepared in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

17.  The appraised value opinion assumes all leases (if any) are current and paid in full as of the effective date of the appraisal.

18.  Excel grids and tables may have slight deviations due to rounding, which may have a nominal impact on value.

19.  The appraised value opinion assumes all formulas used in the Excel grids throughout the report are accurate.

20.  Unless noted, value assumes no apparent adverse site, building or zoning issues or conditions.

21.  Site and building sizes are based on public record, data services, client and/or appraiser measurement at the time of appraisal and are considered reliable, but not guaranteed.

22.  If any of the above if found to be different, value could change.

46

Report Type: Appraisal Report

## CERTIFICATION

**I certify that, to the best of my knowledge and belief:**

1) The statements of fact contained in this report are true and correct.

2) The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analysis, opinions, and conclusions.

3) I have no (or specified) present or prospective interest in the property that is the subject of this report, and no (or the specified) personal interest with respect to the parties involved.

4) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5) My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6) My compensation for completing this assignment is not contingent upon the development or reporting of predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7) My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8) The reported analyses, opinions and conclusions were developed, and this report has been prepared in conformity with the requirements of the Appraisal Institute's Code of Professional Ethics and Standards of Professional Appraisal Practice, which includes the Uniform Standards of Appraisal Practice.

9) **William R. Waytas** has made a personal inspection of the property that is the subject of this report. **Ethan Waytas** did not inspect the subject property. (If more than one person signs the report, this certification must clearly specify which individuals did and which individuals did not make a personal inspection of the appraisal property).

10) No one provided significant professional assistance to the person signing this report.  (If there are exceptions, the name of each individual providing significant professional assistance must be stated.)

11) In accordance with the competency provision USPAP, I have verified that my knowledge, experience and education are sufficient to allow me to competently complete this appraisal.  See attached qualifications.

12) As of the date of this report, William R. Waytas has completed the requirements of the continuing education program of the appraisal institute.

13) The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representative.


Ethan Waytas
Trainee Appraiser MN 40368613
Date: see report

William R. Waytas
Certified General MN 4000813
Date:  see report

47

Report Type: Appraisal Report

## *CURRICULUM VITAE*

**Appraisal Experience**

Presently and since 2006, **Ethan Waytas** has been employed as an employee of Nagell Appraisal & Consulting, an independent appraisal firm (13 employees) who annually prepare 1,500 +/- appraisal reports of all types. He is currently a full time licensed trainee real estate appraiser, as well as the director of the company's IT department.

**Properties appraised:**

- *Commercial* - *low and high-density multi-family, retail, office, industrial, restaurant, church, strip-mall, fast-food, convenience stores, auto-service and repair, cinema, numerous special use properties, and subdivision analysis.*

- *Residential* – *single-family residences, hobby farms, lakeshore, condominiums, townhouses, REO and land.*

- *Eminent Domain* – *extensive partial and total acquisition appraisal services provided to numerous governmental agencies and private owners.*

- *Special Assessment* – *numerous street improvement and utilities projects for both governmental and private owners.*

- *Clients* - *served include banks, savings and loan associations, trust companies, corporations, governmental bodies, relocation companies, attorneys, REO companies, accountants and private individuals.*

- *Area of Service -* *most appraisal experience is in the greater Twin Cities Metro Area (typically an hour from downtown metro).  Numerous assignments throughout Minnesota.*

**Professional Membership, Associations & Affiliations**

License:  Trainee Real Property Appraiser, MN License #40368613

**Education**

--       Graduate of the University of Minnesota: College of Science and Engineering, Twin Cities Campus
Bachelor of Science in Computer Science, with distinction

--       **General & Professional Practice Courses & Seminars**
--       Basic Appraisal Procedures
--       Basic Appraisal Principles
--       2012-2013 15-Hour National Uniform Standards of Professional Appraisal Practice

48

Report Type: Appraisal Report

Curriculum Vitae -- continued

## Appraisal Experience

Presently and since 1985, **William R. Waytas** has been employed as a full time real estate appraiser. Currently a partner and President of the Nagell Appraisal & Consulting, an independent appraisal firm (12 employees) who annually prepare 1,500 +/- appraisal reports of all types.  Mr. Waytas was employed with Iver C. Johnson & Company, Ltd., Phoenix, AZ from 1985 to 1987.

## Properties appraised:

- *Commercial* - *low and high-density multi-family, retail, office, industrial, restaurant, church, strip-mall, fast-food, convenience stores, auto-service and repair, hotel, hotel water park, bed & breakfast, cinema, marina, numerous special use properties, and subdivision analysis.*

- *Residential* – *single-family residences, hobby farms, lakeshore, condominiums, townhouses, REO and land.*

- *Eminent Domain* – *extensive partial and total acquisition appraisal services provided to numerous governmental agencies and private owners.*

- *Special Assessment* – *numerous street improvement and utilities projects for both governmental and private owners.*

- *Review* – *residential, commercial and land development.*

- *Clients* - *served include banks, savings and loan associations, trust companies, corporations, governmental bodies, relocation companies, attorneys, REO companies, accountants and private individuals.*

- *Area of Service -* *most appraisal experience is in the greater Twin Cities Metro Area (typically an hour from downtown metro).  Numerous assignments throughout Minnesota.*

## Professional Membership, Associations & Affiliations

License:  Certified General Real Property Appraiser,  MN License #4000813.
Appraisal Institute:  SRA, Senior Residential Appraiser Designation,
General Associate Member
Employee Relocation Council:  CRP Certified Relocation Professional Designation.
International Right-Of-Way Association:  Member
HUD/FHA:  On Lender Selection Roster and Review Appraiser
DNR:  Approved appraiser for Department of Natural Resources

## Testimony

--      Court, deposition, commission, arbitration & administrative testimony given.

## Mediator

--      Court appointed in Wright County.

## Committees

--      President of Metro/Minnesota Chapter, 2002, Appraisal Institute.
--      Chairman of Residential Admissions, Metro/MN Chapter, AI.
--      Chairman Residential Candidate Guidance, Metro/Minnesota Chapter, AI.
--      Elm Creek Watershed Commission, Medina representative 3 years.
--      Medina Park Commission, 3 years.

Report Type: Appraisal Report

Curriculum Vitae -- continued

## Education

--    Graduate of Bemidji State University, Minnesota.  B.S. degree in Bus. Ad.
--    During college, summer employment in building trades (residential and commercial).
--    Graduate of Cecil Lawler Real Estate School.  Past Arizona Real Estate License.

--    **General & Professional Practice Courses & Seminars**
--    Course 101-Introduction to Appraising Real Property.
--    Numerous Standards of Professional Practice Seminar.
--    Fair Lending Seminar.
--    Eminent Domain & Condemnation Appraising.
--    Eminent Domain (An In-Depth Analysis)
--    Property Tax Appeal
--    Eminent Domain
--    Business Practices and Ethics
--    Scope of Work
--    Construction Disturbances and Temporary Loss of Going Concern
--    Uniform Standards for Federal Land Acquisitions (Yellow Book Seminar)
--    Partial Interest Valuation Divided (conservation easements, historic preservation easements, life estates, subsurface rights, access easements, air rights, water rights, transferable development rights)

     **Commercial/Industrial/Subdivision Courses & Seminars**
--    Capitalization Theory & Techniques
--    Highest & Best Use Seminar
--    General & Residential State Certification Review Seminar
--    Subdivision Analysis Seminar.
--    Narrative Report Writing Seminar (general)
--    Advanced Income Capitalization Seminar
--    Advanced Industrial Valuation
--    Appraisal of Local Retail Properties
--    Appraising Convenience Stores
--    Analyzing Distressed Real Estate
--    Evaluating Commercial Construction
--    Fundamentals of Separating Real Property, Personal Property and Intangible Business Assets

     **Residential Courses & Seminars**
--    Course 102-Applied Residential Appraising
--    Narrative Report Writing Seminar (residential)
--    HUD Training session local office for FHA appraisals
--    Familiar with HUD Handbook 4150.1 REV-1 & other material from local FHA office.
--    Appraiser/Underwriter FHA Training
--    Residential Property Construction and Inspection
--    Numerous other continuing education seminars for state licensing & AI

## Speaking Engagements

--    Bankers
--    Auditors
--    Assessors
--    Relocation (Panel Discussion)

## Publications

--    Real Estate Appraisal Practice (book): Acknowledgement
--    Articles for Finance & Commerce and Minnesota Real Estate Journal

50

Report Type: Appraisal Report

*ADDENDA*

Report Type: Appraisal Report

# NAGELL APPRAISAL & CONSULTING
### 12805 Highway 55
### Plymouth, MN  55441
### *Established in 1968*

Minneapolis: 952-544-8966
St. Paul       651-209-6159
Central Fax   952-544-8969

Client: Usset, Weingarden & Liebo PLLP                                July 31, 2014
Attn: Kevin Dobie, Attorney
4500 Park Glen Road #300
Minneapolis, MN  55416

RE:      Appraisal of a triplex property (Real Estate Only)
         3990 Sunset Drive
         Spring Park, MN

Dear Kevin:

Thank you for your interest in obtaining appraisal services regarding the property above.  Per our conversation, you indicated an appraisal report with the following research and analysis is needed.

**Report Use:** Bankruptcy Court action brought by Citi Mortgage Inc.

**Value Type:** Current market value as is, reflecting the highest and best use per Uniform Standards of Professional Appraisal Practice will be provided.

**Property Interest to be Appraised:**  Fee simple interest.

**Property Description:**  Triplex on Lake Minnetonka, subject dock slips  are rented.

*Contact for access:*  Donald Driggs at 952-270-6700.

**Scope of Report:** (1) View the subject property and neighborhood. (2) Report the physical and/or economic factors that could affect the property. (3) Appropriate research, collection, verification, analysis and viewing of pertinent market data will be conducted.  **The appropriate approach(s) to value will be applied.** (4) Where appropriate, comparables will be adjusted on a grid. (5) Report findings and conclusions.

**Report Format:** An **Appraisal Report** (standard summary narrative format) will be used.  It has a summary of statements of the data. analysis and conclusions.  Appropriate photos, maps and exhibits are included.  A PDF copy will be p

**Fee:** The fee i          check for the full amount is due prior to submitting the report.  Any testifying and preparation, report revisions/update/upgrades are extra and billed              ur, a retainer fe is due two weeks prior to the court date of i

**Due Date:** The report can be completed by              ied confirmation and access are prompt.

**Information needed by the appraiser at inspection:** Any site/building plans and current rents.

**Our Company:**  Nagell Appraisal has 12 employees and has been in business since 1968 and has sufficient knowledge, experience, education, contacts and resources to competently complete this assignment.  Neither the employment to make the appraisal, nor the compensation for it, is contingent upon the appraised value of the property.  If you agree to the above terms, please sign below and return by fax or mail.  If you have any additional questions, please do not hesitate to contact me.

Sincerely,

William R. Waytas, SRA, CRP
Certified General 4000813, MN

Signature _____

Date _____ 9-1-14 _____

www.callnagell.com

52

EXHIBIT A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA
MINNEAPOLIS DIVISION

In Re:

Chapter 11

Donald Andrew Driggs

Case No. 13-42355

Debtor.

UNSWORN DECLARATION FOR PROOF OF SERVICE

I, Darren A. Kachan, employed on this date by USSET, WEINGARDEN, & LIEBO, PLLP
attorney(s) licensed to practice law in this court, with office address of 4500 Park Glen Road,
Suite 300, Minneapolis, Minnesota 55416, upon penalty of perjury, declares that on August 18,
2014, I served the annexed **Amended Objection to the debtor's Third Modified Plan**, via first
class mail postage prepaid, upon each of the entities named below:

Donald Andrew Driggs          Douglas Stone
P.O. Box 405                  H & R Block
Spring Park, MN 55384         8906 Highway 7
                              St. Louis Park, MN 55426-3919
A.J. Driggs
12135 13th Street NW
Spicer, MN 56288

And delivered by email notification under CM/ECF on the day e-filed with the court to each of
them as follows:

Sarah J. Wencil, Esq., Office of the United States Trustee

Joseph W. Dicker, Attorney for Debtor

Thomas Flynn, Attorney for Debtor

/s/ Darren A. Kachan
Darren A. Kachan

-11-